710 So.2d 1077 (1998)
Edward MORGAN
v.
ABC MANUFACTURER, DEF Insurance Company, GHI Parts Suppliers, et al.
No. 97-C-0956.
Supreme Court of Louisiana.
May 1, 1998.
Rehearing Denied June 26, 1998.
*1078 Lisa A. Montgomery, for Applicant.
Bettye A. Barrios, Ronald A. Johnson, Johnson, Johnson, Barrios & Yacoubian, New Orleans, for Respondent.
KNOLL, Justice.[*]
This case presents the issue of whether a general or lending employer who is in the business of hiring out temporary employees to other businesses is liable for its borrowed employee's tortious conduct while in the performance of his work with the borrowing employer. In LeJeune v. Allstate Insurance Co., 365 So.2d 471 (La.1978), this Court determined that both the special and the general employer may be solidarily liable for the torts of a "borrowed" employee. This opinion revisits LeJeune in the context of a temporary agency providing industrial workers. We reaffirm our holding in LeJeune, and we further hold that where a general employer is engaged in the business of hiring out its employees under the supervision of another employer, the general employer remains liable for the torts of the "borrowed" employees.

FACTS
On October 23, 1992, Edward Morgan, an employee of Goldin Industries of Louisiana, Inc. (Goldin), was cutting iron for scrap in the "burning field" of Goldin's yard in Harvey, Louisiana. Morgan was severely injured when he was struck by a large piece of scrap iron which fell free while being transported across the Goldin yard by a crane. Morgan alleged that the iron which struck him was negligently hooked to the crane by Daryl Hines, an employee of Worktec Temporaries, Inc. (Worktec), who was working in the Goldin yard that day as an industrial laborer.[2]
Worktec is a temporary services provider, supplying technical employees such as engineers in addition to general laborers to its customers. In the instant case, Worktec entered into an agreement with Goldin to provide industrial laborers to work in Goldin's scrap yard in Harvey, Louisiana. In accordance with service standards submitted to Goldin, Worktec agreed to "recruit, screen, test, provide orientation, assign and continually monitor the performance" of the assigned employees. Worktec also agreed to provide workers compensation insurance, general liability insurance, and unemployment insurance for any assigned employee. Worktec handled all administration and clerical duties that were required, and it billed Goldin $7.65 per hour for the industrial laborers it provided.
Once assigned, Hines followed the instructions given him by Mark Harding, Goldin's operations manager, and Keith Templet, the operator of the crane at Goldin's facility. Any tools or equipment required were provided by Goldin. Although Goldin could dismiss Hines from its yard, only Worktec had the power to hire and fire Hines. At the end of each week, Hines would fill out a Worktec time sheet stating his hours worked and submit it to a Goldin supervisor for verification. *1079 Hines would then submit the verified time sheet to Worktec who would issue his paycheck. Worktec paid Hines an hourly wage of $5.00 from which it deducted Hines' state and federal payroll taxes.
There is no dispute that under the agreement, Hines at all times remained Worktec's payroll employee. The agreement provided that after a Worktec employee had been assigned for 12 weeks, Goldin could transfer that employee to its own payroll with no further obligation. However, the agreement provided that any Worktec employee hired away by Goldin during the first 12 weeks of an assignment would result in a "liquidation fee." Although Hines had been assigned to report to work in the Goldin yard for several months before the accident occurred, Goldin did not exercise its option to place Hines on its own payroll. Following the accident, Hines continued working for Worktec at the Goldin assignment as well as assignments with other Worktec customers. Additionally, as a result of the accident, Worktec required Hines to submit to a drug screening in accordance with Worktec personnel policies.
In addition to its assertions that Hines did not hook the load and that the accident was caused by the crane operator's negligence, Worktec maintained that it was not liable as Hines' employer because Hines had become the borrowed employee of Goldin.[3] In support of its borrowed employee defense, Worktec submitted the following jury instruction, which was approved by the trial court and read to the jury:[4]
An employer, such as Worktec Temporaries, Inc., who lends its employees to another company is called a general or lending employer. The borrowing employer, such as Goldin Industries, is called the borrowing or special employer. If, after consideration of the ten factors listed above, you find that Worktec Temporaries was a lending employer, then Worktec is relieved of liability. The party who alleges that an employee has become a borrowed employee, in this case Worktec Temporaries, bears the burden of proving it by a preponderance of the evidence. In this matter, in order to escape liability, Worktec must prove that its employee, Darryl Hines, at some point became the borrowed employee of Goldin Industries, Inc. If you find that Darryl Hines was Worktec's employee, and not Goldin Industries' borrowed employee, then you may find Worktec liable for damages to Edward Morgan caused by Worktec's negligence, if any.[5]
In its answer to a jury interrogatory, the jury found that Hines was the borrowed employee of Goldin. As instructed by the jury interrogatory, the jury then ended its deliberation and returned its verdict to the court. The trial court entered judgment in favor of Worktec, dismissing Morgan's suit with prejudice. The court of appeal affirmed. We granted writs to determine whether a general employer that operates as a temporary employment service agency can be held vicariously liable for the negligent conduct of its loaned employees.

EMPLOYER LIABILITY FOR BORROWED SERVANT
In Louisiana, employers are vicariously liable for the torts of their employees under La.Civ.Code art. 2320, which provides: *1080 Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed.
Teachers and artisans are answerable for the damage caused by their scholars or apprentices, while under their superintendence.
In the above cases, responsibility only attaches, when the masters or employers, teachers and artisans, might have prevented the act which caused the damage, and have not done it.
The master is answerable for the offenses and quasi-offenses committed by his servants, according to the rules which are explained under the title: Of quasi-contracts, and of offenses and quasi-offenses.
Although Article 2320 provides that employers are only liable when they might have prevented the act which caused the damage, the courts of this state have consistently held that employers are vicariously liable for any torts occasioned by their employees. Ermert v. Hartford Ins. Co., 559 So.2d 467 (La. 1990).[6] This judicial interpretation of La. Civ.Code art. 2320 has been codified by the legislature in La.R.S. 9:3921, which provides, in part: "every master or employer is answerable for the damage occasioned by his servant or employee in the exercise of the functions in which they are employed."
In the past, the courts of this state recognized that under certain circumstances, an employer, called the "general employer," who has relinquished control of his employee to another employer, known as the "special employer," may be legally absolved of liability for that employee's torts. This legal fiction, known as the "borrowed employee" defense was recognized by this Court in Benoit v. Hunt Tool Co., 219 La. 380, 53 So.2d 137 (1951). In Benoit, a welder in the general employ of Hunt Tool Company negligently injured two employees of his special employer, Morris and Meredith, Inc., a drilling company. The court stated:
[I]t is often difficult where two possible masters are involved to determine which is liable for the tort, and to determine such liability we must look to the doctrine of the borrowed servant or employee pro hac vice. In determining liability under this doctrine, in some cases the courts have imposed liability on the person in whose business the employee was engaged at the time the tort was committed. In others the test has been the right of control over the servant at the time the tort was committed.
Benoit, supra at 389-90, 53 So.2d 137.
The two prevailing tests for determining borrowed employee status can be summarized as follows. The "whose business" test inquires as to which employer's work was being performed at the time the accident occurred. The "right of control" test focuses on which employer had the right to control the specific acts of the employee at the time of the accident, the reasoning being that that employer is in the best position to prevent the injury. The two tests tend to overlap since an employer's right to control is generally coextensive with the scope of his business, and the tests are often used in a complimentary fashion by the courts in an attempt to determine which of the two employers should be liable. Benoit, supra; The Standard Oil Company v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480 (1909).
*1081 In Benoit, the Court held that under the circumstances, Hunt was vicariously liable for the welder's tortious conduct based on a finding that he was not the borrowed servant of Morris and Meredith. This determination was based on the fact that Hunt retained almost complete control over its loaned employee. Hunt selected the welder, provided him with welding tools, paid his wages, and had the right to fire him. Morris and Meredith had no control over the methods employed by the welder in the performance of his job duties on the drilling rig.
Under the borrowed servant doctrine as it existed when Benoit was decided, the finding of borrowed servant status eliminated the possibility of vicarious liability on the part of the general employer. Liability was an "either or" issue: either the special employer was liable or the general employer was liable, but not both. The idea was that a servant could have only one master at a time, and a finding that a loaned employee was a borrowed servant meant that his relationship with the general employer was temporarily suspended, thus precluding liability.[7]
Over the years, numerous courts[8] and commentators[9] expressed concern regarding the continuing applicability of the borrowed employee doctrine, especially considering the inconsistent results that the jurisprudential tests produced. The problem associated with the "right of control" test is that it is inconsistent with the premise of respondeat superior, namely, that direct fault of the employer need not be shown for the employer to be held liable. The test overlooks the fact that in a typical situation, the general employer retains broad control over its employees while the special employer has control over the details of the work. Since liability is based on the right of control, rather than actual control of the employee at the time of the accident, it is unreasonable to choose between the two employers when each shares the right to control the employee's actions. The same can be said of the "whose business" test; it is not unusual that the business of both the general and special employer is furthered at the same time by the employee's actions. Because the tests were so general, the outcome of many cases with parallel facts depended on which facts the courts chose to emphasize, creating inconsistent precedent. Courts holding general employers liable emphasized the general control those employers had over their employees. Similarly, courts finding against special employers focused on *1082 the special employer's right to supervise the employee at the time of the tort.

DUAL EMPLOYERS
Aware of these inconsistencies, this Court revisited the issue of the borrowed employee defense, and repudiated the "one master" rule of Benoit in favor of finding both the general employer and the special employer solidarily liable for the torts of the borrowed employee. In LeJeune v. Allstate Insurance Co., 365 So.2d 471 (La.1978), a hearse driver loaned from Ardoin's Funeral Home of Ville Platte, Inc. to Ardoin's Funeral Home of Mamou, Inc. negligently failed to stop at a flashing red light during a funeral cortege. An employee of the special employer (Mamou) who was riding in the hearse was killed in the resulting collision between the hearse and an automobile with the right of way. Although the court found that the driver was the borrowed employee of the special employer, the court held the general employer liable, stating:
Nevertheless, this [borrowed employee] determination should not relieve the general employer of his liability for his employee's negligent acts done in the pursuance of duties designated for him by his employer, in whose pay he continued and who had the sole right to discharge him. This is especially so in the present case, where the employee was loaned out to another in a continuing arrangement between the employers for their mutual benefit.
* * * * * *
A number of other jurisdictions have likewise held that both the general and special employer may be held solidarily liable for the employee's tort. We believe this to be the better rule and, accordingly, overrule expressions indicating to the contrary, as well as the two decisions of the intermediate courts (see footnote 11) which expressly held the general employer not liable to a third person for torts committed by his employee while loaned to a special employer.
We conclude, therefore, that under the circumstances, Ville Platte, the general employer, is liable to the plaintiffs for the damages caused them by Lafleur while negligently driving the hearse for Mamou.
LeJeune, supra at 481-82. (Footnotes omitted).
The "dual employer" rule was recently reaffirmed by this court in Blair v. Tynes, 621 So.2d 591 (La.1993), wherein we held both a general and a special employer liable to a third party for damages caused through the negligence of five loaned sheriff's deputies. In Blair, we stated:
Our jurisprudence has held that special and general employers may be solidarily liable in tort to third parties injured by the negligence of their employees. In LeJeune v. Allstate Ins. Co., 365 So.2d 471 (La.1978), we addressed the issue of whether the general employer of a negligent employee remained liable for its employee's tort despite the fact that the employee had been borrowed to perform services for a special employer at the time of an accident. We held that a general and special employer may be solidarily liable for injuries to a third party caused by an employee's negligence.
Blair, supra at 599.
As noted above, there is no legislative expression regarding the borrowed employee defense. It is a jurisprudential creation. The immunity provided to the general employer is in derogation of the general tort rights of victims. Thus the scope of the immunity must be strictly construed. See Sewell v. Doctors Hospital, 600 So.2d 577 (La.1992). As we see it, the issue before this Court is not whether the scope of the borrowed employee defense should be restricted only to employers who exercise supervisory control over the borrowed employee. Rather, this Court must determine whether the borrowed employee defense extends to the circumstances of the instant case, namely, whether temporary agencies who are in the business of lending their employees under the supervision of others should receive the benefit of tort immunity.[10] In short, *1083 Worktec asserts that its lack of supervisory control over its own employee should form the basis for its tort immunity. We are not persuaded by this argument.
This Court's limitation of the borrowed employee defense in LeJeune and Blair is supported by the continuing development in the law of employer liability or respondeat superior. While the borrowed servant defense focuses on which employer controlled the employee's actions, modern justification for employer liability is not based so much on the employer's control of the employee's actions, but on the concept of "enterprise liability." In Ermert v. Hartford Ins. Co., 559 So.2d 467 (La.1990), this Court recently stated:
The master's vicarious liability for the acts of its servant rests not so much on policy grounds consistent with the governing principles of tort law as in a deeply rooted sentiment that a business enterprise cannot justly disclaim responsibility for accidents which may fairly be said to be characteristic of its activities.
Ermert, supra at 476.
To a temporary services provider such as Worktec, loaned employees are its stock in trade. Though the essence of Worktec's business is to profit from its employee's labors, a significant feature of its business is to pass control of the details of the work to its customers. However, Worktec retains ultimate and overriding authority over its loaned workers. This makes the application of the traditional "right of control" test problematic. Additionally, Worktec only bills its customers for the hours its employees actually work for those customers. The loaned employees are furthering the business of Worktec at the identical time when they are also furthering the business of the special employer. Put simply, both employers had contemporaneous control over Hines, and both contemporaneously benefitted from his labor. It is therefore reasonable that considering the overlapping control and shared financial interest that they share liability. As noted by Professor Galligan:[11]
The two master rule is the more sensible rule, especially in cases where the general employer is engaged in the business of renting out people and equipment (or at least sometimes renting out people and equipment). In situations where the general employer's business is to rent out his or her employees and equipment to others, the general employer's business is being furthered even if he does not control the details of the actual work. Moreover, the special employer benefits: it is his work that is being done as well. In such situations, the relevant enterprise benefitted by the work consists of the combination of the general and special employers. The two master rule represents a triumph of function over (legal) fiction.
Thomas C. Galligan, Jr., A Primer on the Patterns of Louisiana Workplace Torts, 55 Louisiana Law Review at 91 (1994).[12]
*1084 The labor provided by Worktec is its product, and Worktec should bear the expenses and risks associated with its product, in addition to reaping the benefits derived therefrom. Since modern justification for employer liability is not based so much on the employer's control of the employee's actions, but on the concept of "enterprise liability," Worktec's failure to exercise direct supervisory control over Hines should not preclude its liability. We therefore hold that where, as here, a general employer is in the business of hiring its employees out under the supervision of others, the general employer remains liable for the "borrowed" employees' torts under La.Civ.Code art. 2320.
In the present case, plainly the jury instruction given by the trial court follows the "one master" rule and is inconsistent with the current law of the borrowed servant doctrine in Louisiana. The approved instruction provided: "[i]f after consideration of the ten factors listed above, you find that Worktec Temporaries was a lending employer, then Worktec is relieved of liability." LeJeune and Blair, supra, specifically repudiated the "one master" rule in favor of solidary liability among the general and the special employers. Put simply, a determination that Hines was the borrowed employee of Goldin does not preclude Worktec's liability. The trial court clearly erred as a matter of law in instructing the jury otherwise.
Accordingly, we find that the trial court committed legal error in instructing the jury that a finding that Hines was Goldin's borrowed employee would relieve Worktec of liability for his torts. When such a prejudicial error of law skews the trial court's finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo. Lasha v. Olin Corp., 625 So.2d 1002 (La. 1993). Accordingly, for the foregoing reasons, we reverse and remand the case to the Fifth Circuit Court of Appeal for further consideration of the trial record and for a de novo decision on the merits.
REVERSED AND REMANDED TO THE COURT OF APPEAL.
MARCUS and TRAYLOR, JJ., dissent and assign reasons.
VICTORY, J., dissents for the reasons assigned by MARCUS, J.
MARCUS, Justice, dissenting.
I disagree with the majority opinion holding a general employer that operates as a temporary employment service agency vicariously liable for the workplace tort of its loaned employee under circumstances where the general employer handles only administrative matters and had no right to control the employee's work activities at the time of the accident. Worktec supplied Hines to the special employer, Goldin, upon request for a general laborer. Goldin told Hines where to go and gave him instructions as to what to do and how to do it. The special employer also supervised Hines's work on a day-to-day basis. Goldin provided Hines with tools and equipment necessary for the performance of his various work assignments. The only services provided by Worktec consisted of paying Hines and covering his payroll taxes, worker's compensation premiums, and unemployment taxes.
Moreover, the majority opinion produces an inequitable result for employees working side-by-side based on the fortuitous nature of who injures them. An employee such as Morgan who is injured through the tortious conduct of a temporary employee is granted a tort recovery while employees injured by another regular employee are limited to worker's compensation. The result is also unjust for the general employer. In situations such as this where an employee injures a co-employee, the special employer will always be immune from suit and the temporary employment service agency will shoulder the entire burden of paying for the employee's tort. Therefore, it is not a situation of spreading the costs of doing business between dual employers, but rather a system of requiring the party least able to *1085 prevent the accident to pay for all of the damages caused by it.
I believe that application of respondeat superior principles regarding vicarious liability produces a more equitable result and is more consistent with our prior jurisprudence as it allows courts to consider the particular facts and circumstances of each workplace tort situation in determining whether to hold the general employer, the special employer, or both liable for an employee's tort.
In Louisiana, an employer's vicarious liability derives from La. Civ.Code art. 2320. Article 2320 states that an employer is strictly liable for damage caused by its employees in the performance of the functions in which they are employed. The employer's liability is predicated on the existence of a respondeat superior or master/servant relationship. This court has considered vicarious liability in multiple employment relationships on three occasions of note. These cases demonstrate that the general employer's right to control the loaned employee is key to finding the continuing existence of a respondeat superior relationship between a general employer and its loaned employee.
In Benoit v. Hunt Tool Co., 219 La. 380, 53 So.2d 137 (1951), a welder in the general employ of Hunt Tool Company negligently injured two employees of his special employer, an oil well drilling company. We held Hunt vicariously liable for the welder's tortious conduct based on a finding that he was not the borrowed servant of the special employer. Id. at 399-400, 53 So.2d at 143. This determination was based on the fact that the general employer, Hunt, retained almost complete control over its loaned employee. Hunt selected the welder, provided him with welding tools, paid his wages, and had the right to fire him for any cause. More importantly, the special employer could make suggestions, but had no control over the methods employed by the welder in the performance of his job duties on the oil rig. We note that at the time Benoit was decided, a finding of borrowed-servant status eliminated the possibility of vicarious liability on the part of the general employer. The idea was that a servant could only have one master at a time, and a finding that a loaned employee was a borrowed servant meant that his relationship with the general employer was temporarily suspended, thus precluding secondary tort liability. Id. at 399, 53 So.2d at 143.
A similar issue presented itself in LeJeune v. Allstate Insurance Co., 365 So.2d 471 (La. 1978). In that case, a hearse driver loaned from Ardoin's Funeral Home of Ville Platte, Inc. to Ardoin's Funeral Home of Mamou, Inc. negligently failed to stop at a flashing red light during a funeral cortege. An employee of the special employer, the Mamou funeral home, riding in the hearse was killed in a resulting car collision between the hearse and an automobile with the right of way. We held the insurer of the general employer, the Ville Platte funeral home, liable for the loaned driver's negligent conduct. Id. at 482-83. In so doing, we stated that both the general employer and the special employer may be held vicariously liable for damage caused by a loaned employee under circumstances in which both employers retain sufficient control over his actions.[1] This "dual employer" concept overruled the one master rule of Benoit and its predecessors. The result in LeJeune makes good sense as this was not really a traditional borrowedservant situation because both funeral homes exercised significant, continuing control over the work of the loaned hearse driver, and he was acting in furtherance of the business of both companies.[2] For example, the driver's supervisor at his general employer *1086 assigned him to the task of driving for a funeral at the special employer's business on the day of the accident. The special employer then detailed the route to take and provided other particulars about the job. In addition, the two funeral homes had an ongoing practice of sharing employees back and forth during periods of need. Under such circumstances, the loaned hearse driver was engaged in the work of both businesses, and was subject to their concurrent control and supervision.
Most recently, in Blair v. Tynes, 621 So.2d 591 (La.1993), we reaffirmed the concept of dual employers, and held both a general and a special employer vicariously liable to a third party for damages caused through the negligence of five loaned sheriff's deputies. Id. at 599. The deputies were hired by the American Legion to direct traffic in connection with a fundraising function at the American Legion Home. One person attending the event was killed and another injured due to the deputies' negligence in failing to protect pedestrians from oncoming cars while crossing a highway to get to their cars in the parking lot. The deputies were clearly acting in a law enforcement capacity in providing traffic control for the private event. Their general employer, the sheriff's office, trained the officers and dictated their methods of performing such a job. However, the special employer, the American Legion, determined how many deputies to hire for the job, and directed the loaned deputies to perform particular duties throughout the evening. In each of these cases, the general employer was held vicariously liable because it exercised a significant degree of control over the loaned employee's work.
The application of these principles to a temporary employment service agency such as Worktec is one of first impression before this court. However, the issue before us has been considered by courts in a number of other states in recent years. See, e.g., McDaniel v. Troy Design Services Co., 186 Ariz. 552, 925 P.2d 693 (Ct.App.1996); Staffing Resources, Inc. v. Nash, 218 Ga.App. 525, 462 S.E.2d 401 (1995); Bright v. Cargill, Inc., 251 Kan. 387, 837 P.2d 348 (1992); Hoffman v. JDM Associates, Inc., 213 Mich.App. 466, 540 N.W.2d 689 (1995); Kenyon v. Second Precinct Lounge, 177 Mich.App. 492, 442 N.W.2d 696 (1989); Perry v. Express Services, Inc., 143 Or.App. 321, 923 P.2d 673 (1996); Kunz v. Beneficial Temporaries, 921 P.2d 456 (Utah 1996). These cases almost uniformly support finding dual employers in such situations. See McDaniel, 925 P.2d at 697; Bright, 837 P.2d at 366; Kenyon, 442 N.W.2d at 698; Perry, 923 P.2d at 677; Kunz, 921 P.2d at 458-59. Still, a general employer is held vicariously liable for the loaned employee's torts only if a continuing respondeat superior relationship exists. This requires a finding that "`at the time of injury, [the general employer] retained total or partial concurrent control over the tortfeasor's work.'" Kenyon, 442 N.W.2d at 700 (quoting Marsh v. Tilley Steel Co., 26 Cal.3d 486, 162 Cal.Rptr. 320, 606 P.2d 355, 357 (1980)); see also McDaniel, 925 P.2d at 695-96; Kunz, 921 P.2d at 461, 463.
In the present situation, the general employer, Worktec, performed only administrative tasks such as issuing Hines's paycheck, deducting taxes, and payment of worker's compensation premiums. Although Worktec possessed the right to terminate Hines's employment, Goldin could reprimand, discipline, or discharge Hines from his assignment at the Goldin yard. This, in effect, gave Goldin the power to "fire" Hines from his temporary assignment. Moreover, Worktec did not retain any day-to-day control or supervision over his specific work tasks. Goldin trained Hines, provided him with any necessary equipment or tools, told him where to go and what to do at the Goldin yard, as well as how to do it. Worktec, on the other hand, provided Hines as a general laborer and had no knowledge of the specific job duties Goldin assigned to him. These factors illustrate that the special employer, Goldin, exercised sole control and supervision over Hines's activities on the job. Worktec's control over the administrative aspects of Hines's employment is insufficient to subject Worktec to vicarious liability for the negligence of its loaned employee.
Accordingly, I respectfully dissent.
*1087 TRAYLOR, Justice, dissenting.
I agree with Justice Marcus that employer vicarious liability requires at least some control on the part of the employer. I disagree with both him and the majority that Article 2320 imposes strict liability on employers; consequently, I write separately to address the unconstitutionality of the majority's action in ignoring the exculpatory third paragraph of Article 2320. Because Justice Marcus has ably articulated this court's various interpretations of Article 2320, I will not discuss those interpretations.
That the Court's interpretation of Article 2320 has changed along with changes in society is not surprising; such an evolution in interpretation is to be expected, indeed required, if this Court is to perform its duty. Today's society is far different from that of 1804, when the Code Napoleon, Article 1384, first addressed the control issue with regard to employee torts. These societal changes, particularly in the areas of mobility and communication, have forced our courts to periodically reevaluate the amount and type of control which an employer must maintain over an employee to gain the protection of the exculpatory third paragraph of the Article.
While I recognize that under certain circumstances an employer should be found to maintain control over employees even when the employer could not possibly prevent negligent acts, some control, at least, is required by the statute. The proper issue before this Court is what amount of control is necessary, not whether control should or should not be required at all. That question has been answered in the affirmative by the legislature.
The majority correctly cites to La. Civ. Code art. 2320 which defines the liability of employers for their employees. The Article's third paragraph reads in pertinent part, "responsibility only attaches, when the ... employers... might have prevented the act which caused the damage, and have not done it." The majority quotes, then ignores, this exculpatory paragraph, merely noting that "[b]ut whatever the reason or reasons which prompted the original article, courts step by step have refused to apply the exculpatory clause." Op. at 1080, n. 6 (citing to Stone, Louisiana Civil Law Treatise, Tort Doctrine § 89). The majority then tacitly admits that its action is ultra vires by stating, "This judicial interpretation of La. Civ. Code art. 2320 has been codified by the legislature in La. R.S. 9:3921," as though the legislature has a duty to override unconstitutional judicial vetoes of legislation. Rather than supporting the majority's argument, Section 9:3921 concerns an employers's rights, or lack thereof, with regard to remission, transaction, compromise, or other discharge as between the creditor and employee. La. R.S. 9:3921.
The Constitution of the State of Louisiana provides that the judicial branch shall not exercise legislative power. LA. CONST. arts. 1, 2. The relationship of the courts with the legislature has been defined on numerous occasions by this Court. "The law is the solemn expression of legislative will" and the purpose of the judiciary is to "merely interpret such expressions." Tullier v. Tullier, 464 So.2d 278, 282, (La.1985). Further, courts cannot question the wisdom of fundamental law and frustrate the will of the people; their function is to interpret and apply that law. Arata v. Louisiana Stadium and Exposition Dist., 254 La. 579, 225 So.2d 362 (1969). Here, the majority is not interpreting Article 2320, it is "writing out of the law" the third paragraph of the Article. There is no authority for such a judicial "line-item veto." Dow Hydrocarbons & Resources v. Kennedy, 96-2471(La.5/20/97), 694 So.2d 215, 218 n. 7.
Surprisingly, the Court penned the following less than three months ago:
[A] court err[s] in allowing its own policy determination to override the policy determination made by the legislature. It is not the prerogative of the judiciary to disregard public policy decisions underlying legislation or to reweigh balances of interests and policy considerations already struck by the legislature. It is not our role to consider the wisdom of the legislature in adopting the statute. It is our province to determine only the applicability, legality, and constitutionality of the statute.
Soloco v. Dupree, 97-1256 (La.1/21/98), 707 So.2d 12 (citations omitted). This language *1088 is in direct support of the dissenters and directly contradicts the position the majority is now taking. Determining the "applicability, legality, and constitutionality" of a statute does not include ignoring, judicially rewriting, or refusing to apply a given law or portions thereof.
The majority states that requiring a plaintiff to prove that an employer retained control over his employee produces inconsistent results, Op. at 1081-1082, presumably because trial courts, viewing the different facts of different cases, sometimes find employers liable and sometimes do not. Aside from raising the obvious question: What consistent result is sought?, this reasoning for disregarding an important portion of a validly enacted statute is without authority. "Courts do not rule on the social wisdom of statutes, nor on their workability in practice. Imperfections in legislation are not in themselves grounds for judicial intervention unless those imperfections result in denial of constitutional rights or infringement on paramount statutory rights." Everett v. Goldman, 359 So.2d 1256, 1270 (La.1978). Here, the injured worker has a full remedy under the law. The only valid objection to the statute as written is that it is unconstitutional, which it is unquestionably not. As Justice Kimball has said, "[O]ur civilian system ... strives to respect legislative will and works to save legislative enactments unless they possess specific constitutional infirmities." Dow, 694 So.2d at 219 (Kimball, J., concurring).
Because the majority has imposed liability on all temporary employers, regardless of the amount of control they may or may not exert over their employees, the majority is deliberately ignoring a statute duly passed by the legislature. Because it is duty of the this Court to interpret and apply La. Civ. Code art. 2320 as written, including its third paragraph, the majority is acting in an unconstitutional manner. I respectfully dissent.
NOTES
[*] Johnson, J., not on panel. Rule IV, Part 2, Sec.3.
[2] Whether Hines actually hooked the piece of iron which struck Morgan is disputed. The jury determined Worktec's liability was pretermitted since Hines was the borrowed employee of Goldin.
[3] Worktec was the only remaining defendant at trial. Several parties had settled with Morgan prior to trial, and others had been dismissed on summary judgment.
[4] The instruction was read to the jury twice. Initially, the court read the instruction prior to deliberation. The court later reread the instruction to the jury during deliberation at the request of several jurors.
[5] The ten factors noted by the trial court in the jury instructions were as follows:

1. First and foremost, who has the right of control over the employee beyond mere suggestion of details of cooperation;
2. Who selected the employee;
3. Who paid the employee's wages;
4. Who had the right to fire the employee;
5. Who furnished the tools and place to perform the work;
6. Whether the new employment was over a considerable length of time;
7. Whose work was being done at the time of the accident;
8. Whether there was an agreement between the borrowing and lending employees;
9. Whether the employee acquiesced in the new work situation; and
10. Whether the original employer terminated his relationship with or relinquished his control over the employee.
[6] See, Stone, Louisiana Civil Law Treatise, Tort Doctrine § 89 at p. 125:

But whatever the reason or reasons which prompted the original article, courts step by step have refused to apply the exculpatory clause, at first as to corporations and later more generally, with the result that Louisiana, like France and the common law, holds the employer liable for damage done by his employee in the course and scope of his employment. Various reasons have been advanced to explain the change: the notion that the employer benefits from the employee's activity on his behalf so he should be responsible for harm done to others by such activity; the availability to the employer of insurance covering such risks, the cost of whose premiums could be readily borne by the employer; the argument that where two innocent parties are involved (the victim and the employer), it is better that the employer bear the loss, the act of the servant being in contemplation of law, the master's act; the notion that the employee is merely carrying out the commands of the employer (as distinguished from the independent contractor).
[7] We note that this remains the prevailing view in many of our sister states. See, e.g., Blackburn v. Gor-Mac Elec., Inc., 667 N.Y.S.2d 549(App.Div.1997); Brown v. Starmed Staffing, L.P., 227 Ga.App. 749, 490 S.E.2d 503 (1997); Wren v. Vaca, 922 S.W.2d 408 (Mo.App.1996); McDaniel v. Troy Design Services Co., 186 Ariz. 552, 925 P.2d 693 (App.1996); Hoffman v. JDM Associates, Inc., 213 Mich.App. 466, 540 N.W.2d 689 (1995); Dirksing v. Blue Chip Architectural Products, Inc., 100 Ohio App.3d 213, 653 N.E.2d 718 (1994); Los Ranchitos v. Tierra Grande, Inc., 116 N.M. 222, 861 P.2d 263 (App.1993); Mainella v. Staff Builders Indus. Services, Inc., 608 A.2d 1141 (R.I.1992); Haight v. Aldridge Elec. Co., Inc., 215 Ill.App.3d 353, 159 Ill.Dec. 14, 575 N.E.2d 243 (1991); Hoffman v. Wells, 260 Ga. 588, 397 S.E.2d 696 (1990); May v. Harper Hosp., 185 Mich.App. 548, 462 N.W.2d 754 (1990); Brickner v. Normandy Osteopathic Hosp., Inc., 746 S.W.2d 108 (Mo.App.1988); Stocker v. Shell Oil Co., 105 Wash.2d 546, 716 P.2d 306 (1986).
[8] See Benoit v. Hunt Tool Co., 219 La. 380, 391, 53 So.2d 137, 140 (1951); LeJeune v. Allstate Ins. Co., 365 So.2d 471 (La.1978); Nepstad v. Lambert, 235 Minn. 1, 50 N.W.2d 614 (1951); New York Central R.R. v. Northern Indiana Pub. Serv. Co., 140 Ind.App. 79, 221 N.E.2d 442 (1966); Reader v. Ghemm, 490 P.2d 1200 (Alaska 1971).
[9] See Cardozo, A Ministry of Justice, 35 Harvard Law Review 113, 121 (1921); J. Dennis Hynes, Chaos and the Law of the Borrowed Servant: An Argument for Consistency, 14 Journal of Law and Commerce 1 (1994); Borrowed Servants and the Theory of Enterprise Liability, 76 Yale Law Journal 807 (1967); Liability for Torts of Borrowed Servant, 28 Ohio State Law Journal 550 (1967); Smith, Scope of the Business: the Borrowed Servant Problem, 38 Michigan Law Review 1222 (1940). These inconsistencies are also reflected in the Restatement of Agency 2d (1957) in two seemingly contradictory provisions:

§ 226. Servant Acting for Two Masters
A person may be the servant of two masters, not joint employers, at one time as to one act, if the service to one does not involve abandonment of the service to the other.
§ 227. Servant Lent to Another Master
A servant directed or permitted by his master to perform services for another may become the servant of such other in performing the services. He may become the other's servant as to some acts and not as to others.
[10] In contrast, note that Goldin's tort immunity in the instant case is a result of a specific legislative provision of the Worker's Compensation statutes. La.R.S. 23:1032. In enacting the Worker's Compensation system, the legislature struck a balance under which employers were liable to their employees for designated benefits and medical expenses resulting from workplace accidents regardless of the employee's contributory negligence in causing those injuries. The legislature simultaneously curtailed the employee's tort remedies against these employers. There is no such quid pro quo found in the jurisprudential application of the borrowed employee defense.
[11] Professor of Law, Paul M. Hebert Law Center, Louisiana State University.
[12] Several of our sister states have also asserted the concept of dual employers as a solution to the inconsistencies produced by the borrowed servant defense. In Kastner v. Toombs, 611 P.2d 62 (Alaska 1980) the Alaska Supreme Court stated:

In our opinion the borrowed servant rule as an exception to the doctrine of respondeat superior has imparted unnecessary complexity to the law of agency. We see no reason for a rule of exclusive liability in situations in which a servant acting within the course and scope of his employment for two masters negligently causes injury to another. The question of how the loss so caused should be distributed should be determined in accordance with principles of contribution and indemnity. These principles have been devised to answer questions concerning the allocation of losses among potentially responsible parties.
Kastner, supra at 65 (footnotes omitted). See also, Gordon v. S.M. Byers Motor Car Co., 309 Pa. 453, 164 A. 334 (Pa.1932); Strait v. Hale Constr. Co., 26 Cal.App.3d 941, 103 Cal.Rptr. 487 (1972); Bright v. Cargill, Inc., 251 Kan. 387, 837 P.2d 348 (1992); McDaniel v. Troy Design Services Co., 186 Ariz. 552, 925 P.2d 693 (App.1996) (Fidel, J., Dissenting).
[1] Under the circumstances, this statement amounted to no more than dicta in LeJeune as the hearse driver's special employer was also the employer of the decedent, and therefore, immune from suit.
[2] As noted by the majority opinion, the prevailing view in many states is the one master rule. In such states, either the general employer or the special employer may be held vicariously liable for an employee's tort, but not both. Even in the states that recognize dual employers, control is generally considered essential to a finding of vicarious liability on the part of either employer. The majority opinion in this case holds both the general employer, Worktec, and the special employer, Goldin, solidarily liable for workplace torts simply based on their status as dual employers.