DECISION
Defendant and Third Party Defendant Aureus Radiology, LLC ("Aureus") renews its motion pursuant to Rule 56 of the Rhode Island Superior Court Rules of Civil Procedure in this negligence action asserted against it by Plaintiff Joseph D. Apostolico ("Plaintiff") and Third Party Plaintiff Roger Williams Medical Center ("RWMC"). Finding no genuine issues of material fact, this Court holds that Aureus is entitled to judgment as a matter of law.
 I Facts and Travel
On June 5, 2006, Plaintiff experienced chest pain and sought treatment at RWMC. An emergency room physician at RWMC ordered a computer tomography ("CT") scan of Plaintiff's chest with contrast, a liquid dye that is injected into the body before a CT scan or x-ray to help increase the detail in internal images of the body.
CT scan technician Lindsay Shapiro ("Ms. Shapiro") prepared Plaintiff for the CT scan by performing the contrast injection. At the time of performing Plaintiff's contrast *Page 2 
injection, Ms. Shapiro was a "traveling" CT scan technician employed by Aureus and on loan to RWMC pursuant to a client agreement (the "Client Agreement"). See RWMC Ex. E: Client Agreement. Immediately following the injection, Plaintiff alleges that he experienced severe pain, burning, and swelling of his hand and arm.
Plaintiff filed the instant matter with the Superior Court on March 19, 2007, alleging a single count of negligence against RWMC. (Compl. ¶¶ 6, 7.) On September 7, 2007, RWMC filed a third party complaint against Aureus, alleging that Ms. Shapiro acted as Aureus' servant in conducting the contrast injection at issue; therefore, RWMC contended, Aureus was vicariously liable for any alleged negligence of Ms. Shapiro under the doctrine ofrespondeat superior. (Third Party Compl. ¶¶ 3, 5.) On February 21, 2008, Plaintiff filed an amended complaint adding a second count of negligence against Aureus. (Am. Compl. Count II.)
Aureus' motion for summary judgment first came before the Court, Stern, J., on June 15, 2010. In its original motion, Aureus maintained that it could not be liable under arespondeat superior theory of liability because Ms. Shapiro was the borrowed servant of RWMC. Accordingly, the Court conducted a thorough review of the relevant provisions of the Client Agreement to determine whether it was clear as a matter of law that RWMC had assumed the requisite control over Ms. Shapiro's performance to relieve Aureus of liability pursuant to the borrowed servant doctrine. Namely, the Court noted that Paragraph 7 of the Client Agreement, entitled "DIRECTION AND SUPERVISION," provided that "[a]ll HC Professionals [i.e., Ms. Shapiro] accepted by Client [RWMC] shall, when rendering services, be under the direction and supervision of Client [RWMC] and not Aureus Radiology, LLC." (Hr'g Tr. 15:5-10, June 15, 2010; see also RWMC Ex. *Page 3 
E: Client Agreement.) Mindful that this provision "weighs heavily in favor of finding that [RWMC] exercised complete control over the servant," the Court went on to address Paragraph 3.5 of the Client Agreement, entitled "QUALITY ASSURANCE PROGRAM." (Hr'g Tr. 15:15-24.) Paragraph 3.5 provided
 "Aureus Radiology, LLC will provide Client [RWMC] with a designated Staffing Supervisor as the primary contact for each Assignment. This individual will be responsible for regular contact and communication with the HC Professional assigned [Ms. Shapiro], including the management of any complaints or concerns, and overall coordination of the services of the HC Professional assigned." (RWMC Ex. E: Client Agreement.)
In light of our Supreme Court's reasoning in Agostini v. W.J.Halloran Co., 82 R.I. 466, 111 A.2d 537 (1955), the Court identified a genuine issue of material fact in the role of the staffing supervisor.[1] (Hr'g Tr. 16:14-19.) Ultimately, the Court denied Aureus' original motion without prejudice, explaining
 "Here, however weak, improbable or, in this Court's opinion, unlikely that [RWMC]'s assertions of Aureus's retention of control may have appeared, there still is a very limited material issue of fact concerning whether Shapiro was, in fact, a borrowed servant of [RWMC]." Id. at 17:6-11. *Page 4 
On September 10, 2010, the Court, Vogel, J., entered a scheduling order reiterating the earlier denial based upon "a legal issue of borrowed servant" and establishing a timeline for the parties to conduct additional discovery as to this limited legal issue.
On January 7, 2011, Aureus filed the instant renewed motion for summary judgment. In support of its renewed motion, Aureus submitted the affidavit of its General Counsel, Natalie Nowak, in which Ms. Nowak testified that "Aureus exercises no control or supervision over the HC Professional while he/she is performing services for the Client." (Affidavit of Natalie Nowak ("Nowak Aff.") ¶ 6.) RWMC filed an objection to Aureus' renewed motion. RWMC avers that Aureus erroneously limited the scope of its renewed motion to the finite issue of the role of the staffing supervisor and that newly acquired deposition testimony from Ms. Nowak and Justin Mahr, Manager of Client Relations for Aureus, directly contradicts Ms. Nowak's affidavit.
 II Standard of Review
On a summary judgment motion, this Court reviews the evidence and draws all reasonable inferences in the light most favorable to the non-moving party. Chavers v. Fleet Bank (RI), N.A.,844 A.2d 666, 669 (R.I. 2004). On such a motion, the Court is to determine only whether a factual issue exists. It is not permitted to resolve any such factual issues. The "purpose of the summary judgment procedure is issue finding, not issue determination."Estate of Giuliano v. Giuliano, 949 A.2d 386, 391 (R.I. 2008) (quoting Industrial Nat'l Bank v. Peloso,121 R.I. 305, 307, 397 A.2d 1312, 1313 (1979)). Summary judgment is appropriate if it is apparent that no material issues of fact exist and the moving party is entitled to judgment as a matter of law."Chavers, 844 A.2d at 669. *Page 5 
A party opposing a motion for summary judgment "`carries the burden of proving by competent evidence the existence of a disputed material issue of fact and cannot rest on allegations or denials in the pleadings or on conclusions or legal opinions.'"Id. at 669-70 (quoting United Lending Corp. v. City ofProvidence, 827 A.2d 626, 631 (R.I. 2003)).
 III Analysis
It is well-settled that, under the doctrine ofrespondeat superior, an employer is vicariously liable for the acts of its employees. Mainella v. Staff BuildersIndus. Services, Inc., 608 A.2d 1141 (R.I. 1992) (citingMorgan v. Lucaski, 581 A.2d 714 (R.I. 1990)). The borrowed servant doctrine, however, provides that under certain circumstances an employer's liability for the acts of its employees may be severed. Mainella, 608 A.2d at 1144 (citing 53 Am.Jur.2dMaster and Servant § 415 (1970)); see alsoHigham v. T.W. Waterman Co., 32 R.I. 578, 80 A. 180 (1911). The Rhode Island Supreme Court first recognized the applicability of the borrowed servant doctrine in Higham v. T.W. WatermanCo., wherein the Supreme Court explained:
 "[T]he weight of authority and legal principle is that the servant sent to fulfill his master's contract remains his servant in all matters pertaining to the performance of that contract . . ., unless by a special arrangement the [servant] is in some or all of these matters placed directly under the control of the [borrowing employer], or unless by the [borrowing employer]'s interference he makes the [servant] his servant as to the particular matter with regard to which he interferes." 32 R.I. at 584, 80 A. at 180.
In this jurisdiction, it is now axiomatic that the "right of control over a borrowed employee is determinative of the question whether he is the servant of the lending *Page 6 
employer or of the borrowing employer." Agostini,82 R.I. at 470, 111 A.2d at 539 (citing Higham,32 R.I. 578, 80 A. 180). As noted by the Higham Court, "[t]he test in all these cases is: Who conducts and supervises the particular work, the doing of which, or the careless and negligent doing of which, causes the injury?"[2] Higham,32 R.I. at 587, 80 A. at 181 (citations omitted).
Before this Court is that very same quintessential borrowed servant question. Here, Aureus argues that it ceded — pursuant to the terms of the Client Agreement — all supervision and control over Ms. Shapiro's work while she was performing her duties as a CT scan technician at RWMC. RWMC, to the contrary, maintains that Ms. Shapiro exercised her own personal judgment while on the job and that RWMC merely gave the direction to Ms. Shapiro that was necessary in order for it to receive the benefit of the Client Agreement. This Court must determine whether as a matter of law Ms. Shapiro's "particular work" remained under the control and supervision of Aureus such that Aureus remained liable for Ms. Shapiro's alleged negligence under the doctrine ofrespondeat superior. Seeid. at 587, 80 A. at 181.
"Whether the lent servant is to continue in the general employment of the lending master is ordinarily a question of fact," although it may at times constitute a question of law. Agostini,82 R.I. at 471, 111 A.2d at 539; J.R. Kemper, Annotation,Borrowed *Page 7 servant rule — Statement of rule; distinctionbetween administrative and medical acts, 29 A.L.R.3d 1065 (1970). "When the facts relied upon to establish the existence of an agency are undisputed, and conflicting inferences cannot be drawn from them, the question of the existence of the agency is one of law for the court." 3 Am.Jur.2d Agency § 352 (1970).
Our Supreme Court has held that "in the absence of evidence to the contrary there is an inference that such general employment [with the lending master] continues so long as the service rendered by the servant is the business entrusted to him by his general employer."Agostini, 82 R.I. at 471, 111 A.2d at 539. The law is clear that the primary source of pertinent evidence in borrowed servant cases is the contract between the lending and borrowing employers.See Vandal v. Conrad Manufacturing Co.,87 R.I. 112, 115, 138 A.2d 816, 817 (1958) (citing Higham,32 R.I. at 581, 80 A. at 179 ("whether the driver was the servant of [the borrowing employer] in that matter must depend upon the terms of the contract in accordance with which [the servant] was sent to [the borrowing employer]")). Thus, this Court focuses its analysis on an examination of the Client Agreement between Aureus and RWMC.
Ms. Shapiro's direction and supervision during her RWMC placement is addressed in Paragraph 7 of the Client Agreement, which reads in part:
 "All HC Professionals accepted by Client shall, when rendering services, be under the direction and supervision of Client and not Aureus Radiology, LLC. Aureus Radiology, LLC will use reasonable efforts to conduct reliable background checks and screening procedures as described herein, but does not guarantee the outcome of any assignment of any HC Professional while under *Page 8 
Client's direction and supervision." (RWMC Ex. E: Client Agreement.)
Without question, the express language of the Client Agreement presents the requisite "evidence to the contrary" to negate the "inference that such general employment continues so long as the service rendered by the servant is the business entrusted to him by his general employer." Agostini,82 R.I. at 471, 111 A.2d at 539. It expresses an unmistakable intent on the part of the contracting parties to transfer the right to exercise direction and supervision over Ms. Shapiro's manner of work from Aureus to RWMC whenever Ms. Shapiro rendered services pursuant to the Client Agreement. See Rotelli v.Catanzaro, 686 A.2d 91, 94 (R.I. 1996) ("a contract is ambiguous only when it is reasonably and clearly susceptible to more than one interpretation"); see also Vincent Co. v. First NationalSupermarkets, Inc., 683 A.2d 361, 363 (R.I. 1996) (holding parties are bound by the plain terms of their contract).
In response, RWMC asserts that Paragraph 7's provisions serve only to ensure that RWMC was able to enjoy the benefit of its contract with Aureus. RWMC relies on our Supreme Court's reasoning inAgostini. There, the plaintiff was injured by the alleged negligent operation of the defendant's crane by the defendant's employee. Agostini, 82 R.I. at 468, 111 A.2d at 538. At the time of the injury, the defendant's crane and the defendant's employee charged with operating the crane were both on loan to a construction company owned by the plaintiff.Id. at 468, 111 A.2d at 538. The defendant sought to avoid liability for the crane operator's negligence, asserting that control over the crane operator's performance had transferred from the crane company to the construction company because the plaintiff directed the crane operator where and how *Page 9 
deep to dig holes at the construction site.Id. at 468-70, 111 A.2d at 538-39. The Agostini Court was not convinced, likening the construction company's degree of control over the crane operator to "that which a person exercises over the driver of the carriage in which he rides," or that minimally required to receive the benefit of the contract.Id. at 471, 111 A.2d at 539 (quoting Higham,32 R.I. at 585, 80 A. at 180). The Court was particularly persuaded by the plaintiff's lack of experience or skill in operating a crane.Agostini, 82 R.I. at 470, 111 A.2d at 539. In other words, the plaintiff in Agostini could only dictate the objectives of the work (i.e., where to dig the holes) but lacked the experience and knowledge to dictate the method and means for reaching those objectives. Conversely, it is undisputed in the instant matter that Ms. Shapiro's on-site supervisor at RWMC was a lead technician with the authority to tell Ms. Shapiro when and if she was performing the tasks of her job in an unsatisfactory or improper manner. (Ann Casey Dep. 16:18-25, 17:1-11, Dec. 2, 2009.) This goes well beyond merely directing Ms. Shapiro to perform an IV contrast injection or to otherwise prepare a patient for a CT scan.
RWMC also submits to the Court the remainder of Paragraph 7, which reads
 "Client agrees not to assign, reassign (float), or utilize the assigned HC Professional in any capacity or function other than the designated area of qualification and competence without the prior consent of Aureus Radiology, LLC. Client agrees to obey all federal, state and local laws and to pay any penalties assessed to employees of Aureus Radiology, LLC as a result of Client's noncompliance." (RWMC Ex. E: Client Agreement.)
RWMC avers that Paragraph 7's concluding sentences evince Aureus' right to continued control over Ms. Shapiro. Indeed, Paragraph 7 does identify two areas in which Aureus *Page 10 
maintained some semblance of control over Ms. Shapiro, including the right to control where she could be assigned and in which capacities she could be used. Regardless, these areas of control are immaterial to this Court's analysis, which must turn on who conducted and supervised the "particular work," the negligent doing of which caused Plaintiff's injury.[3] See Higham,32 R.I. at 587, 80 A. at 181 (citations omitted); see alsoAgostini, 82 R.I. at 470, 111 A.2d at 539 (addressing employers' respective rights to control the servant crane operator in the "actual operation of the crane" as dispositive of whose servant he was).
Here, Aureus loaned Ms. Shapiro to RWMC for the purpose of performing the duties of a CT scan technician. Such work included performing IV contrast injections in preparation for CT scans on RWMC patients. Plaintiff alleges that Ms. Shapiro's negligent performance of an IV contrast injection while at RWMC caused his injury. According to the express terms of Paragraph 7 of the Client Agreement, RWMC — not Aureus — possessed the right to direct and supervise all of Ms. Shapiro's contrast injections performed during her placement at RWMC, including the contrast injection she performed on Plaintiff's hand. Therefore, looking solely at Paragraph 7 of the Client *Page 11 
Agreement, this Court must conclude that Ms. Shapiro was RWMC's servant and that Aureus thus bore no liability for the contrast injection she performed on Plaintiff.
This Court's inquiry, however, is not confined to Paragraph 7 of the Client Agreement. In denying Aureus' original motion for summary judgment, the Court specifically identified a genuine issue of material fact in the role of the staffing supervisor as described in Paragraph 3.5 of the Client Agreement. That provision reads:
 "Aureus Radiology, LLC will provide Client with a designated Staffing Supervisor as the primary contact for each Assignment. This individual will be responsible for regular contact and communication with the HC Professional assigned, including the management of any complaints or concerns, and overall coordination of the services of the HC Professional assigned." (RWMC Ex. E: Client Agreement.)
The Court sought further evidence regarding how much, if any, right of control Ms. Shapiro's designated staffing supervisor possessed over the manner and means of Ms. Shapiro's work as a CT scan technician pursuant to the Client Agreement. In support of its renewed motion, Aureus submitted the affidavit of its General Counsel, Natalie Nowak, attesting to the nature of the staffing supervisor position. Ms. Nowak testified that the staffing supervisor's job duties were limited to the following:
 a) to act as a contact person and to field any complaints or concerns that the Client may have with respect to an HC Professional or a particular assignment;
 b) to act as a contact person for the HC Professional with respect to any concerns or complaints with respect to the assignment;
 c) to act as a Customer Service Representative and an Account Manager; *Page 12 
 d) to complete a performance review of the HC Professional based upon client feedback, . . .;
 e) to perform other services for HC Professionals, such as secure local housing for assignments. (Nowak Aff. ¶ 3.)
Further, Ms. Nowak swore that the staffing supervisors neither traveled to client locations to perform any oversight of HC Professionals nor were they required to possess the medical training or experience necessary to direct and supervise HC Professionals in their provision of health services. (Nowak Aff. ¶¶ 4, 5.)
RWMC relies on the deposition testimony of Justin Mahr to contravene Ms. Nowak's characterization of the staffing supervisors' role. Mr. Mahr testified that the staffing supervisors' job duties included ensuring that the lent employees abided by their work schedules, ensuring they arrived at their proper work assignment locations, and conducting regular status checks on their overall performance. (Mahr Dep. 33:4-23.) These status checks — conducted about once every ten days — would inquire as to whether the lent employees were arriving on time, adhering to hospital policies, providing good patient care, and exuding a pleasant work demeanor. Id.
Contrary to RWMC's assertions, Mr. Mahr's testimony is not in material conflict with Ms. Novak's affidavit. The "status checks" to which Mr. Mahr refers are entirely consistent with the role of a customer service representative and the administration of performance reviews based upon client feedback. Nowhere in Mr. Mahr's testimony does he indicate or even suggest that the staffing supervisors possessed the right to control the manner of performance of the lent employees' job duties while on *Page 13 
assignments or that they actually conducted and supervised the work itself.[4] See Higham,32 R.I. at 587, 80 A. at 181 (citations omitted); see alsoAgostini, 82 R.I. at 470, 111 A.2d at 539.
Finally, RWMC submits Ms. Nowak's deposition testimony in which she indicated that Aureus, by the terms of the Client Agreement, implicitly ensured that Ms. Shapiro was capable of performing her role as a CT scan technician and had the capacity to make independent decisions. See Nowak Dep. 64:24 — 65:18, Nov. 17, 2010. The Court finds this evidence completely irrelevant to the matter at bar. Were this motion concerning a breach of implied contract, misrepresentation, or a negligent hiring claim, perhaps Aureus' implied promises would be of some import. Before this Court, however, is the limited issue of whether the borrowed servant doctrine applies to relieve Aureus of liability for Ms. Shapiro's actions. It matters not whether Ms. Shapiro exercised independent judgment. SeeAgostini, 82 R.I. at 470, 111 A.2d at 539 ("the right of control over a borrowed employee is determinative of the question whether he is the servant of the lending employer or of the borrowing employer"). Moreover, Ms. Nowak went on to testify that Aureus maintained no control over the clinical care of patients at RWMC. (Nowak Dep. 85:10-16.) *Page 14 
Despite the clear language of the Client Agreement transferring the right to exercise direction and supervision over Ms. Shapiro's manner of work, this Court denied Aureus' original motion for summary judgment. The Court denied the original motion because it identified a genuine issue of material fact regarding the applicability of the borrowed servant doctrine. In particular, the Court questioned whether Aureus' staffing supervisors had the right pursuant to the Client Agreement to manage the manner of Ms. Shapiro's performance of CT scan technician duties while rendering services at RWMC. Upon filing its renewed motion for summary judgment, Aureus provided sworn affidavit testimony clarifying the role of its staffing supervisors and confirming that they do not and cannot exercise any supervision or direct the manner in which lent employees provide clinical care to RWMC patients. For the foregoing reasons, this Court finds that RWMC has produced no material evidence to the contrary.
 IV Conclusion
After due consideration of all the evidence, together with the arguments advanced by counsel at the hearing and in their memoranda, the Court grants Defendant and Third Party Defendant Aureus Radiology, LLC's renewed motion for summary judgment. Counsel shall submit the appropriate judgment for entry.
[1] In Agostini, the trial justice had ruled as a matter of law that a temporary worker was not a borrowed servant and thus remained an employee of his staffing agency. Agostini,82 R.I. at 468-70, 111 A.2d at 538-39. In reversing, our Supreme Court held that although the evidence was strong that the "borrowing" master did not control the temporary worker, a question of fact nonetheless remained. Id. at 472, 111 A.2d at 540. On review, the Supreme Court ruled that a jury question existed as to who was the true master of the temporary worker in light of evidence that the site supervisor acted "as a signalman" to the temporary worker while on the job site. Id. at 472, 111 A.2d at 540.
In considering Aureus' original motion, this Court distinguished the facts before it from those in Agostini. The Court noted that whereas the evidence before it strongly suggested that Ms. Shapiro was RWMC's borrowed servant, the evidence inAgostini weighed heavily toward continued general employment with the staffing agency. (Hr'g Tr. 16:9-14.) Nevertheless, a similar issue of material fact existed in both instances: whether the party seeking to avoid liability maintained a role as a "signalman" of sorts in relation to the temporary worker.Id. at 16:14-19. The Court thus questioned the role of the staffing supervisors at Aureus.
[2] The Court is mindful that numerous courts and commentators have expressed concern over the borrowed servant doctrine's failure to recognize that, in the typical situation, the lending or general employer retains broad control over its employees while the borrowing employer or temporary employer assumes control over the details of the job and the manner of performance. SeeMorgan v. ABC Manufacturer,710 So. 2d 1077, 1081-82 (La. 1998) (discussing criticism of the borrowed servant doctrine's "one master" rule). Nevertheless, our Supreme Court has not seen fit to abandon the "one master" rule, and this Court is so bound.
[3] RWMC likewise highlights deposition testimony from Justin Mahr, Manager of Client Relations for Aureus, indicating that Aureus dictated the minimum number of hours Ms. Shapiro could work and in which capacities she could work, reserved the right to extricate Ms. Shapiro from her temporary employment if she expressed dissatisfaction with the placement, and exercised disciplinary authority over Ms. Shapiro. (Mahr Dep. 22:12-26:15, Nov. 17, 2010.) These areas of control are similarly immaterial to this Court's analysis, which is primarily concerned with who conducted and supervised the actual manner of work. See Higham,32 R.I. at 587, 80 A. at 181 (citations omitted); see alsoAgostini, 82 R.I. at 470, 111 A.2d at 539.
[4] RWMC also attacks the credibility of Ms. Nowak's affidavit, submitting that Ms. Nowak did not begin working for Aureus until two years following the incident and that she never spoke with Ms. Shapiro or reviewed the incident file prior to signing the affidavit. See Nowak Dep. 8:1-5, 11:14-18. It is well-settled, however, that a court shall not evaluate the credibility or the weight of the evidence on a motion for summary judgment.See Boucher v. McGovern,639 A.2d 1369, 1373 (R.I. 1994). This Court will not stray from such an established principle. *Page 1