pPETERS, Judge.
In this tragic case, Bryant Noah was injured while working at a pipe coating facility and ultimately died from his injury. This litigation arises from an attempt to recover damages on behalf of his minor daughter and parents. Named as defendants were Southern Personnel of La., Inc. d/b/a Snelling Personnel Services (Southern Personnel) and Compression Coat Corporation (Compression Coat). These defendants filed motions for summary judgment asserting that they were the employers of Noah at the time of his accident and, as such, they were immune from tort claims. The trial court granted the motions for summary judgment, and the plaintiffs appeal that judgment.
DISCUSSION OF THE RECORD
On September 10, 1996, Noah was hired by Southern Personnel as a laborer. Southern Personnel was in the business of supplying temporary services to other companies, including secretarial, labor, semi-skilled, and professional services. As part of its business, Southern Personnel furnished employees to Compression Coat at its facility in New Iberia, Louisiana. Under this arrangement, Southern Personnel invoiced Compression Coat weekly and Compression Coat paid the invoices. The invoiced amount included, among other things, the cost for the workers’ services, benefits, and workers’ compensation insurance. In turn, Southern Personnel paid the workers.
Compression Coat was in the business of coating steel pipe with concrete for its customers. The concrete coating helped to protect a fusion bond coating on the pipes and provided additional weight to the *476 pipes to keep them submerged in the Gulf of Mexico. In December of 1996, the New Iberia Compression Coat facility directly employed only about five people on average-a field superintendent, two plant ^operators, a secretary, and a mechanic. According to Ricky Williamson, a field superintendent for Compression Coat, Southern Personnel supplied Compression Coat with an average of twenty-four laborers and six operators.[1] Noah was one of the laborers assigned to work at the Compression Coat facility.
On December 12, 1996, while working at the Compression Coat facility, Noah was assigned to work on a “jeep” rack, the purpose of which was to detect flaws in the fusion bond coating. Noah expressed concern that he was not familiar with this job and that he should return to the job he had been performing. However, he was ordered to work in that position until another man returned from lunch. It appears that Noah sustained his fatal injury when his head was caught between two joints of pipe while performing this work.
Prior to Noah’s accident, Kevin Bo-urque, another Southern Personnel employee, had been killed in an accident involving the same pipe rack. Following Bourque’s death, Southern Personnel’s workers’ compensation carrier refused to provide insurance for the Compression Coat facility. Southern Personnel inquired about other insurance but found that the insurance premiums were too expensive.
However, after Bourque’s death, but before Noah’s death, Southern Personnel effected a means of obtaining workers’ compensation coverage at an economically acceptable level. Specifically, Southern Personnel discovered that C.L. Management, Inc. (C.L. Management), an Illinois company, could obtain workers’ compensation insurance at a substantial premium savings. To take advantage of this lower rate, on November 25, 1996, Southern Personnel entered into an agreement with C.L. Management in which it transferred all of its employees to C.L. Management and laC.L. Management in turn leased the employees back to Southern Personnel. This agreement was in effect at the time of Noah’s fatal injury. In fact, C.L. Management paid the workers’ compensation benefits arising from Noah’s accident, although this responsibility was initially disputed by C.L. Management.
On August 27, 1997, a suit for survival and wrongful death damages was filed against Southern Personnel and Compression Coat by Tanya L. Pradia on behalf of Bry’neisha Noah, the minor daughter of Tanya Pradia and Noah. Joseph Carl Noah and Stephanie Bryant Noah, as Noah’s parents, joined in the suit to recover damages for their own mental anguish as a result of reaching their son soon after the accident.
Compression Coat and Southern Personnel each filed a motion for summary judgment, seeking tort immunity on the basis of employment status. Specifically, Compression Coat alleged that it was Noah’s special employer (borrowing employer), and Southern Personnel alleged that it was Noah’s general employer (lending employer). The plaintiffs filed a motion for partial summary judgment on the issue of liability, but the trial court’s grant of the defendants’ motions for summary judgment rendered this motion moot.
In granting the defendants’ motions for summary judgment, the trial court stated:
I find that ... Mr. Noah was the employee of Compression Coat. He was on their premises. They were directing all of the work. They paid a fee which included his salary, insurance benefits including Workman’s Compensation Benefits, the premium for that comp policy and they had complete control over the worker in their yard and over Mr. Noah.
*477 Southern Personnel hired Mr. Noah and put him to work, told him where to go, when to go and had a contract with CL Management Incorporated for the payment of his wages, the payment of benefits. Basically Mr. Noah and all the other personnel became, according to the contract, employees of CL Management, Inc. but that was only on paper. CL Management, Inc. had absolutely no control over these people. So | J find that both Compression Coat and Southern Personnel were employers of Mr. Noah and grant Motion for Summary Judgment in both cases.
The plaintiffs appeal.
OPINION
A motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. La.Code Civ.P. art. 966(B). Summary judgment procedure is now favored and must be construed to secure the just, speedy, and inexpensive determination of every action for which the procedure is permissible. La.Code Civ.P. art. 966(A)(2).
Pursuant to La.R.S. 28:1032(A)(1)(a), an employee or his dependent who is entitled to workers’ compensation benefits is limited to the rights and remedies under the Workers’ Compensation Act to the exclusion of all other rights, remedies, and claims for damages, except for intentional acts and unless otherwise provided by statute. A borrowing employer is solidarity hable with a general employer for workers’ compensation benefits, see Green v. Popeye’s Inc., 619 So.2d 69 (La.App. 3 Cir.1993), and the borrowed employee is barred from bringing a tort action against the borrowing employer, Johnson v. Rogers & Phillips, Inc., 99-0116 (La.App. 4 Cir. 7/21/99); 753 So.2d 286.[2] The plaintiffs contend that Noah was not the employee of either Compression Coat or Southern Personnel at the time of the accident such that the trial court erred in dismissing their tort claims against these defendants.
| Southern Personnel
The plaintiffs contend that Noah was the employee of only C.L. Management at the time of the accident and injury. In support of their position, they direct us to various provisions in the contract between C.L. Management and Southern Personnel as well as Southern Personnel’s denial of employer status in C.L. Management’s suit against it for declaratory relief in the context of responsibility for payment of workers’ compensation benefits.
In the “PERSONNEL SERVICE AGREEMENT,” Southern Personnel and C.L. Management agreed to the following: “[A]ll persons heretofore employed by [Southern Personnel] on the effective date of this Agreement shall become employees of CLM, with no change in salary, wages or benefits as of such effective date.” C.L. Management agreed “to provide to [Southern Personnel] such laborers, workers, operatives, executives, administrators, and the like, as [Southern Personnel] may require.” Further, Southern Personnel was to pay C.L. Management certain “fees and charges.”
Pursuant to the agreement, C.L. Management was responsible for receiving salary and wage information from Southern Personnel and using that information to calculate salaries and wages for the employees. C.L. Management was also to use that information to calculate its own charges to Southern Personnel. Further, C.L. Management, among other things, was to issue the wage and salary checks for distribution to the employees, provide *478 workers’ compensation insurance, and prepare and submit tax returns and W-2 forms. Southern Personnel agreed, among other things, to provide C.L. Management with accurate salary and wage information, comply with all health and safety laws, and maintain and provide a clean and safe | ¿work environment.
According to the testimony of Wayne Williamson, president of Southern Personnel, C.L. Management was simply the conduit through which Southern Personnel could obtain lower workers’ compensation rates as well as longshore and harbor workers’ compensation. Further, he testified that C.L. Management had no one in Louisiana to exercise control over the workers; that he was screening, hiring, and dispatching the workers; and that C.L. Management expected Southern Personnel to terminate employees. Southern Personnel invoiced Compression Coat for the workers’ services and forwarded payroll information to C.L. Management for it to process the payroll. The actual checks for the workers were issued on Southern Personnel checks. Further, Southern Personnel passed on the cost of workers’ compensation insurance to Compression Coat, although C.L. Management was responsible for obtaining such coverage. Williamson described C.L. Management as “a paperwork shuffler.” He testified that C.L. Management makes its “money by having people on workers’ comp, offering workers’ comp at a good price.” On the other hand, pursuant to the agreement, C.L. Management had the authority to “exercise control over [the employees] as provided to employers by statutory and common law.”
Assuming, without deciding, that a factual dispute exists over whether C.L. Management was the technical employer or whether Southern Personnel was still in fact the employer of Noah, this factual dispute is immaterial in this tort action and does not preclude summary judgment. Specifically, if Southern Personnel was the employer, then it is entitled to tort immunity under La.R.S. 23:1032. If Southern Personnel was not the employer, the tort suit still falls because (1) Southern Personnel |7would not be vicariously liable under La.Civ.Code art. 2320 for any damage occasioned by Noah’s co-employees since they also would no longer be Southern Personnel’s employees and (2) it owed no duty as a matter of law to Noah or the plaintiffs to act for their protection.
In their suit for damages, the plaintiffs allege that Southern Personnel was negligent in failing to provide adequate supervision, to properly train personnel, and to alert personnel to the dangers inherent in the pipe rack operation. In order for the plaintiffs to recover damages under a negligence theory, they must establish the existence of a duty. See Faucheaux v. Terrebonne Consol. Gov’t, 615 So.2d 289 (La.1993). The Louisiana Supreme Court has observed that “where the alleged wrongful conduct of the defendant is a failure to act or ‘nonfeasance,’ courts have found it necessary for some definite relationship between the parties to exist, such that social policy justifies the imposition of a duty to act upon the defendant.” Fox v. Board of Supervisors of La. State Univ. & Agrie. & Mechanical College, 576 So.2d 978, 981 (La.1991).
If, as the plaintiffs assert, Southern Personnel was not the employer, it would have had no duty in that capacity to supervise, train, and warn the workers. Further, Southern Personnel was not the owner or operator of the facility where the accident occurred and, therefore, did not have a duty to exercise reasonable care for the safety of the persons on the premises or a duty to not expose such persons to unreasonable risks of injury or harm, as set forth in Mundy v. Department of Health & Human Resources, 620 So.2d 811 (La.1993). The plaintiffs assert, however, that Southern Personnel had safety responsibilities on the job site because it had contractually agreed to those responsibilities under the C.L. Management contract. The contract |sbetween Southern Personnel and C.L. Management did re *479 quire Southern Personnel to comply with all health and safety laws, regulations, standards, ordinances, directives, orders and rules imposed by any and all Federal, State and local regulatory bodies ... and provide a clean and safe work environment for the Personnel.” However, while a failure to act or nonfeasance in that regard may give rise to an action for breach of contract, which issue is not now before us, the plaintiffs have failed to point us to any authority for the proposition or facts to show that the contract itself created a special relationship between Noah and Southern Personnel for purposes of tort liability. Thus, the trial court was correct as a matter of law in dismissing the plaintiffs’ tort suit against Southern Personnel.

Compression Coat

The plaintiffs also contend that Noah was not the borrowed employee of Compression Coat at the time of the accident but that, in any event, Morgan v. ABC Manufacturer, 97-0956 (La.5/1/98); 710 So.2d 1077, makes that inquiry irrelevant. In Morgan, Worktec Temporaries, Inc., which was in the business of providing temporary employees to other businesses, provided one of its employees, Daryl Hines, to Goldin Industries of Louisiana, Inc. to work in Goldin’s yard. Edward Morgan, Goldin’s employee, was severely injured when he was struck by a large piece of scrap iron that had fallen from a crane, which he alleged was negligently hooked to the crane by Hines. Morgan sued Worktec in tort under the theory of respondeat superior, but Work-tec asserted that it was not liable as Hines’s employer because Hines had become the borrowed employee of Goldin.
A jury found that Hines was the borrowed employee of Goldin, and the trial court entered judgment in favor of Work-tec, dismissing Morgan’s suit. The appellate IflCourt affirmed. The supreme court reversed, rejecting the idea that an employee could have only one employer at a time for purposes of tort liability. In so doing, the supreme court reaffirmed its prior jurisprudence which had held that both the special and general employers may be solidarily liable for the torts of a borrowed employee. Further, the supreme court expanded on that rule and concluded that “where, as here, a general employer is in the business of hiring its employees out under the supervision of others, the general employer remains liable for the ‘borrowed’ employees’ torts.” Id. at 1084.
The plaintiffs assert in their appellate brief that
since the temporary employee can produce tort liability in one co-employer when that employee causes harm to another, then when harm is done to this employee, tort liability should be produced in the other employer. Put still another way, if tort liability runs against the borrowed employee when he does harm, then that same liability should run in his favor when he is injured by another and for the same reasons.
Importantly, in Morgan, the suit at issue was not between Morgan and his employer, Goldin, but was between Morgan and the alleged employer of another individual who was also Goldin’s borrowed employee. Morgan specifically recognized in a footnote that Goldin had tort immunity vis á vis Morgan as a result of La.R.S. 23:1032. Morgan simply rejected the notion that the general employer of employees borrowed by another, in every instance of lending its employees to that special employer, divests itself of its employees for purposes of vicarious liability for its employees’ tortious conduct to third persons. Morgan does not stand for the proposition that a borrowing employer has no tort immunity under La.R.S. 23:1032 for a claim brought by its borrowed employee. Thus, we reject the plaintiffs’ assertion that the inquiry of borrowed employee status is irrelevant in this case.
In any event, the plaintiffs contest the finding that Noah was a borrowed Loemployee of Compression Coat. Rather, *480 the plaintiffs assert that Noah remained the employee of C.L. Management and, thus, did not share the same employer as the Compression Coat employees. Therefore, the plaintiffs contend that Compression Coat is liable for the torts of its employees.
While Noah may have been the employee of C.L. Management/Southern Personnel, he may also have been the borrowed employee of Compression Coat. The following factors are important to consider in making such a determination: (1) who has the right of control over the employee beyond the mere suggestion of details or cooperation, (2) who selected the employee, (3) who paid the employee’s wages, (4) who had the right to fire the employee, (5) who furnished the tools and the place to perform the work, (6) was the new employment over a considerable length of time, (7) whose work was being done at the time of the accident, (8) was there an agreement between the borrowing and lending employers, (9) did the employee acquiesce in the new work situation, and (10) did the original employer terminate his relationship with or relinquish his control over the employee. Green, 619 So.2d 69.[3]

1.Right of Control

The evidence is undisputed that Southern Personnel dispatched the workers to the Compression Coat facility and that it had a safety coordinator at the site to ensure that the workers were present, had their safety equipment on, and were conducting themselves properly. However, it is also undisputed that Compression Coat assigned the workers to their tasks and was responsible for ensuring that the workers Inperformed their tasks correctly.

2. Selection of Employee

The evidence submitted reveals that Southern Personnel screened, hired, and dispatched workers to Compression Coat. Compression Coat did not select the individual employees to be dispatched to it but submitted to Southern Personnel the number of employees it would be needing. However, Ricky Williamson, Compression Coat’s field superintendent, testified that Compression Coat did inform Southern Personnel who it did and did not want to return to the facility the next day.

3. Payment of Wages

C.L. Management/Southern Personnel actually remitted the wages to the workers, but those wages were a component of the amount charged to Compression Coat and remitted to it for the workers’ services.

U- Right to Terminate Employee

Southern Personnel had the right to terminate the workers, but Compression Coat also had the authority to discharge an unsatisfactory worker from its facility.

5. Fumishment of Tools and Facility

Southern Personnel furnished only safety equipment to the workers, but the workers had to pay for this equipment. Compression Coat furnished the tools and the facility for performing the work.

6. Length of Time of New Employment

Southern Personnel hired Noah on September 10, 1996, and he sustained his injury on December 12, 1996. Williamson testified that he thought that Noah went to work at Compression Coat in September of 1996 but that, in any event, Noah was there “for a good two months” before he was injured. There is no evidence to dispute |12this testimony. Thus, it appears that Noah worked at least most, if not all, *481 of the time of his employment at the Compression Coat facility.

7. Work Performed

At the time of the accident, Noah was working on Compression Coat’s jeep rack, the purpose of which was to detect flaws in the fusion bond coating. This work was Compression Coat’s work. Noah was performing C.L. Management/Southern Personnel’s work only to the extent that he provided temporary labor services to Compression Coat.

8. Agreement

Compression Coat and Southern Personnel had an agreement whereby Southern Personnel furnished temporary workers to Compression Coat payable on an hourly basis.

9. Acquiescence in New Employment

While there is evidence that Noah expressed concern over his ability to work on the jeep rack, there is no evidence that he did not acquiesce in the employment with Compression Coat.

10. Termination of Employment Relationship

The evidence reflects that C.L. Management/Southern Personnel did not terminate the employment relationship with the workers, but the evidence also reflects that C.L. Management/Southern Personnel did relinquish control over the workers to the extent of allowing Compression Coat to assign the workers to their individual tasks and to ensure that the workers performed their tasks properly.
There are numerous factual inquiries underlying the determination of borrowed employee status, but the ultimate determination of whether a borrowed employee | ^relationship exists is a matter of law. Dustin v. DHCI Home Health Servs., Inc., 95-1989 (La.App. 1 Cir. 5/10/96); 673 So.2d 356. In this case, given the undisputed facts, we find that the trial court was correct as a matter of law in finding that Noah was a borrowed employee of Compression Coat. Thus, Compression Coat is entitled to tort immunity as a matter of law.
DISPOSITION
For the foregoing reasons, we affirm the judgment of the trial court. We assess costs of this appeal to the plaintiffs.
AFFIRMED.
WOODARD, J., CONCURS IN THE RESULT.

. Wayne Williamson, the president of Southern Personnel, testified that, in 1996, Southern Personnel generally sent Compression Coat 50 to 100 workers per day.

. We note that La.R.S. 23:1031 was amended by Acts 1997, No. 315, § 1, to add current Subsection C, which states: "The special and the general employers shall be entitled to the exclusive remedy protections provided in R.S. 23:1032.”

. We note that the plaintiffs also contend that Compression Coat is not immune from tort liability because it did not participate in the payment of workers' compensation insurance. Although not a factor listed for determining employment status in Green, we note that Compression Coat did participate in the payment of workers’ compensation benefits in that the invoiced amount it paid to Southern Personnel included the cost of workers' compensation insurance.