859 So.2d 877 (2003)
CLARENDON NATIONAL INSURANCE COMPANY, Plaintiff-Appellant,
v.
JEANSONNE & REMONDET, L.L.C., Defendant-Appellee.
No. 37,765-CA.
Court of Appeal of Louisiana, Second Circuit.
October 23, 2003.
Rehearing Denied December 4, 2003.
*878 Crawford & Anzelmo by Brian E. Crawford, Monroe, Jefferson B. Joyce, Baton Rouge, for Appellant.
Mayer, Smith & Roberts by David Butterfield, Shreveport, for Appellee, Jeansonne & Remondet.
Pettiette, Armand, Dunkleman, Woodley, Byrd & Cromwell by Donald James Armand, Jr., Shreveport, for Intervenor/Appellee, Travelers Ins. Co.
Before BROWN, WILLIAMS, and TRAYLOR (Pro Tempore), JJ.
BROWN, C.J.
Clarendon National Insurance Company ("Clarendon") sued the law firm of Jeansonne & Remondet, L.L.C. ("Jeansonne & Remondet") because the firm failed to timely file a third party demand against Travelers Indemnity Co. ("Travelers"). Both parties filed motions for summary judgment. The trial court granted Jeansonne & Remondet's motion limiting its liability to $10,000. Clarendon appeals. We find no error and affirm.

Facts and Procedural Background
On March 28, 1998, Victoria Ogle was driving a 1996 Corvette owned by Courtesy Chevrolet, Inc. ("Chevyland"), on Interstate 20 in Shreveport, Louisiana, when she rear-ended a vehicle driven by Dorothy Blackstone. Both drivers suffered serious injuries.
Ms. Ogle worked for Ark-La-Tex Auto Auction, Inc. ("AAAI"), which sells used vehicles at auction. Chevyland is a car dealership that sells new and used vehicles. Ms. Ogle had picked up the Corvette from Chevyland to drive to AAAI for sale at its auction. Clarendon insured AAAI, and Travelers insured Chevyland.
On January 20, 1999, Mrs. Blackstone and her husband filed suit against Ms. Ogle, AAAI, and Clarendon. They did not, however, file suit against Travelers. The law firm of Jeansonne & Remondet was hired to defend Clarendon and its insureds.
On September 16, 1999, Jeansonne & Remondet filed a motion for leave of court to file a third-party demand against Travelers. In a hearing held on September 20, 1999, the trial court denied the request because it was "certain to cause a delay." Jeansonne & Remondet challenged the trial court's ruling not to allow a third-party demand against Travelers via a writ application to this court, which was denied.
A bench trial was held on October 28, 1999. Judgment was entered on November 16, 1999, in favor of the Blackstones for the amount of $492,306.51. Clarendon did not appeal this judgment and paid this amount in full.
On June 26, 2000, Clarendon filed suit against Jeansonne & Remondet, alleging negligent defense in the Blackstone suit due to its failure to timely file a thirdparty demand against Travelers. On June 26, 2000, Clarendon also filed suit against *879 Travelers in the First JDC for indemnity and/or contribution regarding the judgment rendered in favor of the Blackstones. Travelers subsequently removed this suit to federal court asserting a "late notice" defense. The federal court granted summary judgment in favor of Travelers and dismissed Clarendon's suit. Clarendon did not appeal this ruling.
The parties stipulated that Travelers' liability coverage for this accident was primary, i.e., Travelers' policy limits should have been exhausted before Clarendon would be held liable.
On May 9, 2002, Clarendon filed a motion for partial summary judgment against Jeansonne & Remondet, claiming that no genuine issue of material fact existed concerning Travelers' primary liability or the limits thereof with regard to the Blackstone suit. Specifically, Clarendon urged that the Travelers policy provided primary coverage of $1 million. On August 9, 2002, Jeansonne & Remondet opposed Clarendon's motion and moved for partial summary judgment to declare that the Travelers policy issued to Chevyland only provided coverage of $10,000; therefore, Jeansonne & Remondet argued that it was entitled to partial summary judgment limiting Clarendon's damages to $10,000.
Both parties argued their cross motions for summary judgment. The trial court ruled in favor of Jeansonne & Remondet, finding that the Travelers policy provided only $10,000 in coverage. Pursuant to La. C.C.P. art.1915, said judgment was designated as a final partial judgment. Judgment was signed accordingly on February 18, 2003. Clarendon has appealed devolutively.

Discussion
The determinative issue as to the amount of coverage is contingent upon Ms. Ogle's employment status. Clarendon contends that Ms. Ogle was Chevyland's borrowed servant; Jeansonne & Remondet asserts that she was not.
An insurance policy is a contract that constitutes the law between the parties. Marcus v. Hanover Ins. Co., Inc., 98-2040 (La.06/04/99), 740 So.2d 603; Pareti v. Sentry Indem. Co., 536 So.2d 417 (La.1988). If the wording of the policy is clear and expresses the intent of the policy, the policy must be enforced as written. Id.
Travelers issued a "garage business" policy to Chevyland. Travelers' policy provided coverage of up to one million dollars to permissive users of Chevyland automobiles unless those persons are in the "business of selling, servicing, repairing, parking or storing automobiles". If that was the case, then Travelers' policy would provide only the minimum limits required by the Louisiana Motor Vehicle Safety Responsibility Act ($10,000).
The Travelers policy defines an "insured" for a covered "auto" as
(2) Anyone else while using with your permission a covered" auto" you own, hire or borrow, except:
* * *
(c) Someone using a covered "auto" while he or she is working in a business of selling, servicing, repairing, parking or storing "autos" unless that business is your "garage operations." However, such persons are "Insureds" up to the financial responsibility limits required by Louisiana Motor Vehicle Safety Responsibility law.
Clarendon contends that the Travelers policy covered Ms. Ogle because she was both driving a covered "auto" as defined in the policy and was performing work for Chevyland in its "garage operations." It urges that the specific conduct she was *880 engaged in was not selling, servicing, repairing, parking or storing the Corvette. Clarendon contends that she was "merely gratuitously transporting" the Corvette from Chevyland to her employer, AAAI, to help Chevyland sell cars.
Clarendon maintains that Ms. Ogle was a borrowed servant of Chevyland because the work she performed primarily benefitted Chevyland. While AAAI selected the employee to be sent to Chevyland, if Chevyland was not satisfied with the driver, it could prohibit that driver from operating one of its vehicles. Further, Chevyland could request a certain driver to operate its vehicles. Although admitting that AAAI "gained an advantage" because it could potentially obtain an auctioneer's fee, Clarendon urges that Chevyland stood to benefit more than AAAI by having its cars transported to AAAI. It also contends that AAAI relinquished control of its employees to Chevyland in order to have cars delivered to it.
In deciding whether a borrowed employee relationship exists, the following factors are important to consider in making such a determination: (1) who has the right of control over the employee beyond the mere suggestion of details or cooperation; (2) who selected the employee; (3) who paid the employee's wages; (4) who had the right to fire the employee; (5) who furnished the tools and the place to perform the work; (6) was the new employment over a considerable length of time; (7) whose work was being done at the time of the accident; (8) was there an agreement between the borrowing and lending employers; (9) did the employee acquiesce in the new work situation; and (10) did the original employer terminate his relationship with or relinquish his control over the employee. Pradia v. Southern Personnel of La., Inc., 00-0365 (La.App. 3rd Cir.10/11/00), 776 So.2d 474, writ denied, 00-3018 (La.01/05/01), 778 So.2d 599; Green v. Popeye's Inc., 619 So.2d 69 (La. App. 3rd Cir.1993).
Applying these factors to the case sub judice, Ms. Ogle was not Chevyland's borrowed servant. There is no evidence indicating that Chevyland had any control over Ms. Ogle. While Clarendon contends that AAAI relinquished control of its employees to Chevyland in order to have cars delivered to it, no evidence was proferred into the record to substantiate this claim. AAAI selected Ms. Ogle as its own employee, paid her wages, and retained the right to fire her. While it might be argued that Chevyland provided "tools" for her when it provided her with the keys to the Corvette, Chevyland relinquished control of the vehicle to AAAI and AAAI's separate and distinct garage operation when it turned over the car keys to Ms. Ogle. Chevyland's only expectation was that AAAI would present its vehicle for evaluation and bidding; Chevyland would thereafter either accept or reject the highest bid for its automobile.
Furthermore, the "new employment" i.e., the picking up the automobile and driving it to AAAI, was not for any considerable length of time. AAAI's work was being performed at the time of the accident as its own employee was transporting the Corvette to its place of business in order to be auctioned. Clarendon admits there was no formal agreement between AAAI and Chevyland. The record is devoid of any signed or written agreement regarding Ms. Ogle picking up the car between AAAI and Chevyland; rather, it was apparently a courtesy provided by AAAI to its cohorts as part of its auction business. Finally, AAAI, as Ms. Ogle's "original employer," never terminated its relationship with or relinquish its control over her.
*881 The record contains the deposition of Edward Blakey, the former CEO of AAAI. Mr. Blakey admitted that AAAI had an auto mechanic on staff located on site to perform regular service or repairs and technical work on the vehicles there. He also explained that a body shop was located at AAAI specifically to perform "paint and body work" for the cars about to be sold. Mr. Blakey further stated that AAAI offered auto storage for the vehicles. Finally, and perhaps most importantly, AAAI regularly sold cars.
We find that the Travelers' exclusionary clause is applicable, based on the evidence that the pick up and delivery of vehicles to be sold at auction was a routine and significant portion of AAAI's business. Therefore, the conclusion is inescapable that when an AAAI employee, whose sole duties consist of picking up and delivering automobiles to be sold at auction, is engaged in driving an automobile to her employer's premises, she is engaged in the automobile garage business as such is defined in the Travelers' policy.
The language of the Travelers policy is clear. AAAI is in the business of selling, servicing, repairing, parking and/or storing autos. Ms. Ogle was AAAI's employee and was in the course and scope of her employment when she picked up the Corvette from Chevyland to drive it to her place of employment for sale at auction. AAAI was engaged in a garage operation separate and distinct from Chevyland's business. Ms. Ogle did not become part of Chevyland's business when she was transporting the car to AAAI's auction. The Corvette was owned by Chevyland and covered by Travelers but under its endorsement only to the minimum limits of $10,000.

Conclusion
For the foregoing reasons, we AFFIRM the judgment of the trial court in favor of Jeansonne & Remondet, L.L.C. Costs are assessed to Clarendon National Insurance Company.
AFFIRMED.

APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, GASKINS, DREW, and TRAYLOR, JJ.
Rehearing denied.