DREW, J.
 

 | Joseph McLeod and his wife, Rebecca McLeod, appeal a judgment dismissing their claims against D & J Construction Company (“D & J”). We affirm.
 

 FACTS
 

 Joseph McLeod was employed as a truck driver by Double R Transport, Inc. (“DRT”). DRT was owned by Richard Richardson, who also owned D
 
 &
 
 J. DRT hauled materials exclusively on behalf of D & J.
 

 In October of 2005, D & J was engaged in a road construction project (“project”) along 1-20 in West Monroe. D & J utilized the services of several trucking companies in addition to DRT to haul hot asphalt from its plant to the project site. Among these tracking companies was Moore Trucking Company, Inc. (“MTC”),
 
 [1]
 
 which was owned by Lile Moore. While McLeod and Moore were waiting at the project site to deliver loads of hot asphalt, they allegedly began fighting, which resulted in injury to McLeod.
 

 McLeod and his wife filed suit against Lile Moore, Mike Moore Trucking, Inc., and D & J. The McLeods asserted that Moore was an employee of D & J. D & J filed an answer denying that Moore was its
 
 *192
 
 employee or a borrowed servant at the time of the incident. A petition of intervention was filed by DRT a/k/a D & J and its insurance company to recover workers’ compensation benefits paid to McLeod.
 

 D & J filed a motion for summary judgment against the main claim. Submitted in support of the motion were affidavits and excerpts from depositions. Submitted in opposition to the motions were depositions and | .¿corporate information regarding DRT and D & J. The trial court granted D & J’s motion for summary judgment and dismissed the claim against it. The McLeods have appealed.
 

 DISCUSSION
 

 A motion for summary judgment shall be granted if “the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.” La. C.C.P. art. 966(B). Appellate courts review summary judgments
 
 de novo
 
 under the same criteria that govern the district court’s consideration of whether summary judgment is appropriate.
 
 NAB Natural Resources, L.L.C. v. Willamette Industries, Inc.,
 
 28,555 (La.App.2d Cir.8/21/96), 679 So.2d 477.
 

 Independent Contractor
 

 The McLeods argue that Moore was not an independent contractor; rather, he was an employee of D & J who supplied his own equipment but was controlled by D
 
 &
 
 J, accordingly making D & J vicariously liable for the damages that Moore allegedly caused the McLeods.
 

 Generally, masters and employers are answerable for the damage occasioned by their servants and overseers in the exercise of the functions in which they are employed.
 
 See
 
 La. C.C. art. 2320. In contrast, a principal generally is not liable for the offenses committed by an independent contractor while performing its contractual duties.
 
 Ledent v. Guaranty Nat Ins. Co.,
 
 31,346 (La.App.2d Cir.12/28/98), 723 So.2d 531.
 

 l :.The distinction between employee and independent contractor status is a factual determination to be decided on a case-by-case basis.
 
 Tower Credit, Inc. v. Carpenter,
 
 2001-2875 (La.9/4/02), 825 So.2d 1125.
 

 The supreme court has found the following factors to be relevant in determining whether the relationship of principal and independent contractor exists: (1) there is a valid contract between the parties; (2) the work being done is of an independent nature such that the contractor may employ non-exclusive means in accomplishing it; (3) the contract calls for specific piecework as a unit to be done according to the independent contractor’s own methods, without being subject to the control and direction of the principal, except as to the result of the services to be rendered; (4) there is a specific price for the overall undertaking agreed upon; and (5) the duration of the work is for a specific time and not subject to termination or discontinuance at the will of either side without a corresponding liability for its breach.
 
 Hickman v. Southern Pac. Transport Co.,
 
 262 La. 102, 262 So.2d 385 (1972).
 

 The most important inquiry is whether the principal retained the right to control the work. When applying this test, it is not the supervision and control actually exercised that is significant; the important question is whether, from the nature of the relationship, the right to do so exists.
 
 Hickman, supra; Ledent, supra.
 

 
 *193
 
 Moore started his own trucking business in 1993 and began providing trucking services at that time to D & J, which is owned by his mother’s brother-in-law. In 1998, Moore started a new trucking business under the |4name of Moore Trucking Company of West Monroe. In 2005, MTC owned several dump trucks and paid for its own liability insurance on the trucks and its own workers’ compensation insurance. If MTC’s trucks ever needed repairs, Moore paid his father’s mechanic to perform the work.
 

 For as long as Moore has owned trucks, he has had a verbal agreement with D & J to provide trucks to haul construction materials when needed by D & J. Although other companies utilized MTC’s hauling services, MTC was obligated to provide its trucks first to D & J when needed. In 2005, 80% of MTC’s work was done on behalf of D & J. MTC was not the only trucking company used to haul asphalt for D & J on the project, as companies owned by Moore’s brother and father were also used. Moore guessed that the project had started about a week before the fight occurred.
 

 D & J agreed to pay MTC $4.50 per ton of asphalt hauled from its asphalt plant to the project site. Moore was not paid directly by D & J. Moore’s wife would send an invoice from MTC to D & J each Monday for the prior week’s work, and D & J would pay with a check made out to MTC. In 2005, D & J never issued a payroll check payable to Moore for trucking services, nor did D & J file any W-2s listing Moore as an employee.
 

 Moore parked his trucks overnight at a garage leased by his father and used by the family members’ trucking companies. Jerry White, D & J’s Vice-President of Operations, would contact Moore’s mother each evening to tell her the number of trucks that were going to be needed the next day and where they were to go. White based the number of trucks needed on how much work the asphalt crew predicted they could perform the next day. | ^Moore’s mother then relayed this information to Moore and the rest of his family, and they usually decided among themselves who would send trucks.
 

 D & J controlled the process of loading and unloading the asphalt, and all drivers were expected to operate under the same D & J rules and procedures for loading, delivering, and unloading the asphalt. For example, the load was dumped when the drivers were told to dump it, and the drivers left the project site when they were told to leave. If the paving crew said a load was not going to be dumped, then it was not dumped. MTC’s trucks had to be at the plant before a certain time each day when the loading process started up, but how early they arrived was otherwise up to them, and it was first come, first served, at the plant, although a plant worker could pull a truck out of line. Because the hot asphalt would harden as it cooled and because D & J did not want to keep its spreader at the project site waiting, MTC’s drivers were expected to deliver the asphalt as soon as possible. Once Moore left the asphalt plant, he controlled where he stopped and the duration of his stops as long as his stops were reasonable, although he was expected to keep the loads coming while still obeying traffic laws. MTC’s drivers continued delivering loads during the day until stopped by the foreman at the project or at the plant.
 

 Even though the inquiry into whether or not Moore was an independent contractor is a fact-intensive one that is determined on a case-by-ease basis, it is helpful to examine the particular facts in
 
 Hickman,
 
 where Fowler, a truck driver, was found to be an employee of Southern Pacific.
 

 
 *194
 
 1 f,Fowler’s job responsibilities for Southern Pacific were extensive. They included unloading trucks at Southern Pacific’s warehouse, obtaining bills of lading and loading freight onto his truck, delivering freight, collecting freight charges and remitting the collections to Southern Pacific’s agent, picking up freight from customers, and keeping the warehouse clean. A depot agent often determined the order of deliveries and pickups. In the case at hand, Moore was expected only to bring his truck to the plant for loading, and then to deliver the asphalt to the construction site.
 

 Like Moore, Fowler owned and maintained insurance on his truck. However, except for a job opening graves for a funeral home, Fowler worked only for Southern Pacific. Although MTC hauled primarily for D & J, Moore also made his trucks available for hauling materials on behalf of others in the construction industry.
 

 Fowler’s work for Southern Pacific was considered to be routine as he reported to work at Southern Pacific’s depot at the same time each morning. By contrast, Moore did not report for work with D & J each morning. MTC’s trucks showed up at the asphalt plant only on the days that their trucks were needed.
 

 The rate of Fowler’s compensation was based upon the weight of the freight that he handled. Fowler was paid by a monthly check from Southern Pacific, with the cost of cargo insurance the only deduction. No other deductions were made. MTC’s rate of compensation was somewhat similar, but Moore was not paid directly by D & J, which was billed by MTC. There were no employee withholdings from the payment given to MTC.
 

 17FowIer had a written contract with Southern Pacific. The contract could be terminated by either party with 30 days’ notice, although Southern Pacific retained the right to terminate the contract at any time if it determined that Fowler’s services were unsatisfactory. MTC did not have a written contract with D & J, but there was a verbal agreement or understanding. The lack of a written contract is of no significance in this instance.
 
 See Tate v. Progressive Security Ins. Co.,
 
 2008-0950 (La.App. 4th Cir.01/28/09), 4 So.3d 915.
 

 There are no material facts in dispute. The issue is whether, as a matter of law, the facts as presented establish that Moore was an employee of D & J. They do not. Moore was an independent contractor.
 

 Borrowed Servant
 

 The McLeods next contend that Moore was a borrowed servant of D & J. Regarding the test of whether an individual is a borrowed servant, this court has stated:
 

 In deciding whether a borrowed employee relationship exists, the following factors are important to consider in making such a determination: (1) who has the right of control over the employee beyond the mere suggestion of details or cooperation; (2) who selected the employee; (3) who paid the employee’s wages; (4) who had the right to fire the employee; (5) who furnished the tools and the place to perform the work; (6) was the new employment over a considerable length of time; (7) whose work was being done at the time of the accident; (8) was there an agreement between the borrowing and lending employers; (9) did the employee acquiesce in the new work situation; and (10) did the original employer terminate his relationship with or relinquish his control over the employee.
 

 |sCitations omitted.
 
 Clarendon Nat. Ins. Co. v. Jeansonne & Remondet, L.L.C.,
 
 37,
 
 *195
 
 765 (La.App.2d Cir.10/23/03), 859 So.2d 877,
 
 writ denied,
 
 2004-0002 (La.3/12/04), 869 So.2d 826.
 

 Control over the worker is the most important of the factors.
 
 Wells v. Traynor,
 
 2004-0064 (La.App. 4th Cir.12/01/04), 892 So.2d 21,
 
 cert. denied,
 
 546 U.S. 984, 126 S.Ct. 563, 163 L.Ed.2d 473 (2005).
 

 Considering that Moore owned MTC, it would be highly unusual for D & J to borrow Moore from MTC. Moore, standing in the shoes of MTC, certainly would not terminate the relationship with himself or relinquish control over himself. There was no agreement that MTC would loan Moore to D & J, and there was no acquiescence by Moore to a new work situation. Moore furnished his own trucks and maintained them. Only part of his work was performed at D & J’s facilities, as he would have been on the road while in transit.
 

 In support of their argument that Moore was a borrowed servant, the McLeods rely on
 
 Richardson v. Tate,
 
 269 So.2d 278 (La.App. 4th Cir.1972),
 
 writs denied,
 
 271 So.2d 260, 261 (La.1973), where the tortfeasor, Tate, who drove a truck carrying asphalt for a hauling contractor, B.T. Moore, was found to be a borrowed servant of James, who produced the asphalt and then had it delivered to the site where James was building a parking lot. B.T. Moore derived between 80% and 90% of his business income from James; they had a verbal agreement where compensation was fixed at a stipulated price per ton. Tate was subject to the directions of James’s personnel at both the loading and unloading sites. The operations at | ^James’s asphalt plant also determined when Tate would begin and end working each day.
 

 Tate did not own the truck he drove, as the truck was owned by the hauling contractor. In addition, Tate was merely the driver. In this case, Moore was both the hauling contractor and the driver. Another crucial difference between
 
 Tate
 
 and this matter is that James caused B.T. Moore to fire one driver by insisting that the driver no longer drive. There is no evidence that D & J has ever caused Moore to fire any of his employees, much less himself.
 

 As with the independent contractor issue, the material facts are undisputed. The facts as presented do not establish, as a matter of law, that Moore was a borrowed servant of D & J. The trial court was correct in its finding that Moore was neither an employee nor a borrowed servant of D
 
 &
 
 J.
 

 DECREE
 

 At appellants’ costs, the judgment is AFFIRMED.
 

 [1]
 

 . MTC did business as Moore Trucking of West Monroe.